UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
JAMES D. CARTON, III, and     :
STEVEN C. CARTON,             :
Executors of the Estate of    :     HONORABLE JOSEPH E. IRENAS
James D. Carton, Jr.,         :     CIVIL ACTION NO. 05-5489
                              :
        Plaintiffs,           :
                              :              OPINION
    v.                        :
                              :
CHOICE POINT and CHOICE       :
POINT SERVICES, INC.,         :
                              :
        Defendants.           :
```

**APPEARANCES:**

MCMORAN, O'CONNOR & BRAMLEY
By: Michael F. O'Connor
766 Shrewsbury Avenue
Tinton Falls, New Jersey 07724
          Counsel for Plaintiffs

CHRISTIE PARABUE MORTENSEN YOUNG
By: James W. Christie
216 Haddon Avenue, Suite 703
Westmont, New Jersey 08108

and

WILLIAMS & CONNOLLY LLP
By: Thomas M. Woods, Esq.
    Laurie S. Fulton, Esq.
    Jon R. Fetterolf, Esq.
725 Twelfth Street, N.W.
Washington, D.C. 20003
          Counsel for Defendants

**IRENAS**, Senior District Judge:

Before the Court is the Motion to Dismiss pursuant to Fed. R.

Civ. P. 12(b)(1) and 12(b)(6) of Defendants Choice Point, and

Choice Point Services, Inc. (collectively "Choice Point").[1]  For the reasons that follow, the Motion will be granted in part and denied in part.

## I.

Plaintiffs are the sons of James Carton, Jr. ("Carton") who died on January 19, 2000.  They bring the present class action suit[2] as executors of their father's estate, and as purported representatives of the Class,[3] against Choice Point.

Choice Point locates owners of unclaimed property and offers to assist them in securing the property's return.  Mellon Investor Services, LLC, ("Mellon"),[4] the stock transfer agent for Forest Laboratories, Inc., asked Choice Point to locate Carton because Mellon held in Carton's name 1600 shares of Forest Laboratories, Inc. stock, worth approximately $150,000.[5]  Plaintiffs allege that

---

[1]  It appears from Defendants' brief that Choice Point, Inc, is a holding company and Choice Point Services, Inc. is its subsidiary.  Defendants and Plaintiffs use "Choice Point" to collectively refer to Defendants.

[2]  Subject to the standing analysis discussed *infra*, the Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)2 and 6.

[3]  The Complaint alleges that the Class consists of all people "who entered into an agreement with Choice Point, Inc. and/or Choice Point Services, Inc. for the location of assets and were residents of a State that had adopted the Uniform Unclaimed Property Act." (Compl. at ¶ 32) The present motion does not specifically implicate the class action allegations.

[4]  Mellon currently is not a party to this lawsuit.

[5]  The Complaint alleges that Carton originally purchased 800 shares of Forest Laboratories stock in 1998.  Sometime after the original purchase but before Carton's death, Forest Laboratories authorized a two-for-one stock split, thereby increasing Carton's holdings to 1600 shares.  The Complaint alleges that no stock certificate for the additional 800 shares was issued to

Mellon and Choice Point have a contract for the asset location and recovery services that Choice Point provides.

According to the Complaint, Choice Point conducted a probate search on April 8, 2002, and learned Carton's will was probated in Monmouth County, where he resided at his death.[6]  Later that year, in October, 2002, Choice Point sent Plaintiffs a letter advising that a "stock account" with a "current value in excess of $15,000" was "still outstanding with our client."  (Pls. Ex. 2)  Plaintiffs assert that the letter was misleading because it stated the value of the stocks was in excess of $15,000 when Choice Point knew their value was close to $165,000 at the time.  They also assert the letter was misleading because it listed Carton's address as an Air Force base in Colorado,[7] instead of his Monmouth County address where he had lived for the past 55 years.[8]

In response to the letter, Carton's son, James Carton, III, called Lee Rothman, the assigned "Account Executive" who wrote the letter, to ask what the property was and how much it was worth. The Complaint alleges that Rothman only stated that the asset was

Carton.  After Carton's death, Plaintiffs, unaware of the stock split, sold 800 shares of Forest Laboratories stock, believing that Carton owned only 800 shares.  After the sale, Forest Laboratories authorized another stock split, leaving 1600 shares unclaimed by Carton's estate.

[6]  Plaintiffs also assert that Mellon gave Choice Point the same Monmouth County address.  The record is unclear what information about Carton Mellon had and how it acquired that information.

[7]  Although Carton was enlisted in the Air Force from 1942 to 1945, Plaintiffs assert Carton never lived at the Colorado address.  Nothing in the record explains why the Colorado address was used in the letter.

[8]  Plaintiffs thought that the use of their father's military address indicated the unidentified asset was a military life insurance policy.

3

worth more than $15,000.  Plaintiffs believe Rothman was intentionally vague or evasive about the nature of the asset so as to lure them into agreeing to use Choice Point to recover the asset.

A few days later, Choice Point sent Plaintiffs a "standard agreement" wherein Choice Point agreed to locate the unspecified "asset" in exchange for a finder's fee of 35% of the asset's <u>gross</u> value.  Carton, III, signed the agreement but modified the fee to 33 1/3% of any <u>net</u> recovery.

Choice Point is quick to point out that although a fee agreement was signed, Plaintiffs never paid the fee and Choice Point eventually waived the fee.[9]  At first, however, Choice Point began the process of recovering the stock certificates, writing to Mellon in November, 2002, that Choice Point was "in receipt of a signed contract regarding [Carton's] account" and requesting that a "stop" be placed on the account.[10]  (O'Conner Ex. 5)  Shortly thereafter, Plaintiffs learned that the "asset" Choice Point sought to recover were the Forest Laboratory shares.  Plaintiffs never returned the Letter of Authorization and Irrevocable Stock Power Choice Point required to complete the transaction and then

---

[9]  This apparently came about after Plaintiffs sued Choice Point, Lee Rothman, and Mellon for consumer fraud and violation of statutory duties.  The litigation resulted in a Stipulation of Dismissal after Plaintiffs received the Forest Laboratories stock certificates from Mellon sometime around March 16, 2005.

[10]  It is not entirely clear what effect a "stop" has on an account held by Mellon.  Nor is it clear why Choice Point was able to obtain a "stop" on an account that belonged to Carton.

attempted to recover the stocks directly from Mellon[11] but were unsuccessful because of the stops that were placed on the certificates.  (O'Conner Ex. 10)[12]

Somehow Choice Point came to possess the two stock certificates (each representing 800 shares) on which Mellon had placed stops.  While no party explains how this occurred, Choice Point does not deny that it did at one time have possession of the two certificates.  Moreover, the record at this early stage of the litigation supports the reasonable inference that Mellon gave Choice Point the stock.[13]

Specifically, Plaintiffs allege that Choice Point "unlawfully took possession of the stock" in November, 2002, and "did not return it for three years."  (Pls. Br. at 3)  Plaintiffs further assert that the stocks' value rose during those three years, thereby depriving Plaintiffs of the opportunity to sell the shares for a greater profit than they could have sold them after the certificates were returned.  Plaintiffs assert that at the time the stock was converted by Choice Point, its value was $49.60 per share; it reached a high of $76.08 per share on March 1, 2004; and upon the stock's return around March 16, 2005, its value was $37.32

_____

[11]  See O'Conner Ex. 7.  Plaintiffs are estate attorneys with the law firm Carton Arvantis McGreevy Argeris Zager & Aikins LLC.

[12]  Mellon sent James D. Carton, III a letter informing him of the stop. (O'Conner Ex. 10) The letter, dated February 21, 2003, also reflects an additional stock split which occurred on December 23, 2003-- after Choice Point asked Mellon to place a stop on the previous stock certificates.

[13]  Why Mellon would do so is not at all clear.  Nothing in the record indicates that Choice Point had any right to possess the stock certificates.

a share.[14]

The Complaint alleges violations of (1) the New Jersey Consumer Fraud Act and (2) Uniform Unclaimed Property Act, and common law claims of (3) tortious interference; (4) fraud; (5) "breach of duty;" (6) "exercising dominion over property;" and (7) "interference with possession."

## II.

Rule 12(b)(6) motions necessitate a ruling on the merits, "purely on the legal sufficiency of a plaintiff's case: even were plaintiff to prove all his allegations, he would be unable to prevail." *Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884, 891 (3d Cir. 1977). "If the Court considers matters outside the pleadings in a 12(b)(6) motion, the procedure will automatically be converted into a Rule 56 summary judgment procedure. . . . In addition to having all of plaintiff's allegations taken as true, with all their favorable inferences, the trial court cannot grant summary judgment unless there is no genuine issue of material fact." *Id.*

In contrast, motions pursuant to Fed. R. Civ. P. 12(b)(1) may either "attack the complaint on its face" or "attack the existence

---

[14] Plaintiffs submit market reports from CNNMoney.com as evidence of the stocks' value. However, the dates of these reports are questionable and do not seem to match up with Plaintiffs' facts. Specifically, the first report (O'Conner Ex. 21) bears a date of November 4, <u>2003</u>, but Plaintiffs assert the stock was converted by Choice Point in 2002. For purposes of the present motion only, the Court will assume that the stocks' value did increase, without making a determination as to the amount of the increase.

of subject matter jurisdiction in fact, quite apart from any pleadings." *Id.* Facial attacks are similar to 12(b)(6) motions because the Court must consider the allegations of the complaint as true. "The factual attack, however, differs greatly" because "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. . . . [N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Plaintiffs bear the burden of proving the Court's jurisdiction. *Id.*

Thus, Plaintiffs' reliance on evidence outside the pleadings in this case has two implications for the disposition of the instant motion. First, because Defendants apparently make a factual challenge to jurisdiction (see Def. Br. at 3 n.2), the Court will consider facts outside the pleadings on the 12(b)(1) motion, but will not presume those facts to be true. Second, with respect to the 12(b)(6) motion, the Court will treat the motion as one for summary judgment, accepting Plaintiffs' evidence as true when faced with disputed facts.

The Court will first address the 12(b)(1) motion before proceeding to the 12(b)(6) motion because "[a]bsent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, __ F.3d __, No. 05-2253, 2006

7

U.S. App. LEXIS 20534, *11-12 (3d Cir. Aug. 10, 2006).

## III.

### A.

"The three elements necessary to satisfy the irreducible constitutional minimum of standing are: (1) the plaintiff must have suffered an injury in fact- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Taliaferro,* 2006 U.S. App. LEXIS 20534 at *12 (citing *United States v. Hays,* 515 U.S. 737, 742-43 (1995)); *Miller v. Nissan Motor Acceptance Corp.,* 362 F.3d 209, 221 (3d Cir. 2004).

The parties mainly focus on the first of the three requirements: injury in fact.  Specifically, Choice Point asserts that Plaintiffs have not sustained an injury in fact because Plaintiffs never paid any finder's fee to Choice Point and Plaintiffs now possess the stock certificates.  In opposition, Plaintiffs assert that they were "deprived of the opportunity to sell the stock," which reached its highest value during the time Choice Point allegedly possessed the stock.

Choice Point argues that "Plaintiffs' assertion that they

8

would have sold the stock at the precise moment it reached its zenith in price is pure, unfounded speculation," which is insufficient to establish an injury in fact.  (Def. Reply at 2-3)  However, the cases Choice Point cites in support of their argument are clearly inapplicable, as none of the three addresses constitutional standing.[15]  Moreover, while research has not revealed any case directly on point, the Third Circuit and other courts have generally recognized that loss of an opportunity may be sufficient to satisfy the constitutional minimum for Article III standing.

For example, the Third Circuit held in *Frank v. N.J. Dep. of Civil Service*, that "[l]oss of a job <u>opportunity</u> is unquestionably a distinct and palpable injury" sufficient to satisfy the injury in fact requirement of the standing analysis." 667 F.2d 1099, 1101 (3d Cir. 1981)(emphasis added).  In that case, two female plaintiffs brought a § 1983 suit alleging that the physical agility test given to police officer candidates discriminated against women.  Passing all of the screening tests, including a written civil service examination and a medical examination (in addition to the physical test), only resulted in placement on the "eligibility roster," allowing the women to "continue with the application process and

---

[15]  All three cases deal with issues of state law.  *See FDIC v. McMullan*, 826 F.2d 347 (5th Cir. 1987) (addressing standing under Mississippi law to bring a non-derivative suit under RICO); *Vanderbeek v. Vernon Corp.,* 50 P.3d 866 (Colo. 2002) (recovery of consequential damages under Colorado law); *Himes v. Brown & Co. Securities Corp.*, 518 So.2d 937 (Fla. Dist. Ct. App. 1987)(recovery of lost profit damages under Florida law).

perhaps be hired." *Id.* at 1101-02.  The Third Circuit held that denial of the opportunity to continue in the application process was a sufficient injury to support standing.[16]

Similarly, in *High River Ltd. Partnership v. Mylan Laboratories, Inc.*, 383 F. Supp. 2d 660, 664 (M.D. Pa. 2005), the court held that denial of the right to nominate a new slate of corporate directors was a sufficient injury in fact, regardless of whether plaintiff "will, if relief is granted, actually propose a new slate of candidates." *Id.* at 664.  The court explained, "[a] right is no less valuable merely because it goes unexercised. . . . the loss of opportunity-- whether or not exercised-- constitutes an injury in fact for which judicial redress is potentially available." *Id.*[17]

Thus, the Court is unpersuaded by Choice Point's argument that Plaintiffs lack standing because of the uncertainty that the estate would have sold the shares at their highest value.  The plaintiffs

---

[16] The Court ultimately held that plaintiffs lacked standing because there was no causal connection between their injury (loss of a job opportunity) and the challenged conduct (the discriminatory physical test). Plaintiffs never took the physical test because they failed the written test. Therefore, even if the Court were to invalidate the physical test, it would not redress plaintiffs' injury because their failing score on the written examination would still preclude them from moving on to compete for a position on the police force.  *Frank*, 667 F.2d at 1101-02.

[17] *See also McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284-85 (2d Cir. 2004) (in female student-athletes' Title IX suit, denial of the "opportunity to play for a team that can qualify" for the championships is an injury sufficient to confer constitutional standing); *Alliance for Clean Coal v. Miller,* 44 F.3d 591, 594-95 (7th Cir. 1995) (western coal producers had standing to challenge an Illinois law governing coal use where the injury alleged was the out-of-state producers' loss of opportunity to compete on an even footing with Illinois producers; plaintiffs did not need to prove loss of specific sales).

in *Frank* would not necessarily be hired even if they passed the physical examination.  The proposed slate of directors in *High River* might not actually be voted into office.  Yet such uncertainty did not preclude standing to bring suit, because a distinct harm-- a lost opportunity-- had occurred.  In this case, Plaintiffs assert that Choice Point interfered with the rightful possession of the stock certificates, thereby harming Carton's estate by depriving it of the opportunity to sell the shares at a higher price.  Such an injury was both particularized to Plaintiffs as representatives of the estate that owned the stock, and concrete and actual (i.e. measurable in value lost).

To the extent Choice Point argues that a favorable decision will not redress Plaintiffs' alleged harm because the harm is speculative (prong three of the standing analysis), the Court disagrees.  The Restatement (Second) of Torts § 927 provides: "When one is entitled to a judgment for the conversion of a chattel . . . he may recover . . . in the case of commodities of fluctuating value customarily traded on an exchange to which traders customarily resort, the highest replacement value of the commodity within a reasonable period during which he might have replaced it." While jurisdictions have adopted divergent rules on the *measure* of damages,[18] the only relevant point at this time is that a remedy exists.  Plaintiffs' alleged injury may be redressed despite the

---

[18] *See generally* Higgins, Measure of Damages for Conversion of Corporate Stock or Certificate, 31 ALR 3d 1282.

11

fluctuating value of the stock.  This is true even though the certificates have been returned to Plaintiffs.  *See, e.g., Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003) (owner of impounded car had standing to sue for the damage caused by spray painting of inventory numbers on the car even though the car was returned to him).

Accordingly, the Court holds that the lost opportunity to sell stock at a higher price is an injury sufficient to satisfy the "constitutional minimum" of standing.  Therefore, Choice Point's motion pursuant to Fed. R. Civ. P. 12(b)(1) will be denied.

**B.**

(1)  New Jersey Consumer Fraud Act Claim

Choice Point argues that Plaintiffs have failed to demonstrate an "ascertainable loss," an element essential to a NJ CFA claim.  The statute states: "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction." N.J.S.A. § 56:8-19 (emphasis added).  "To state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the

12

defendants' unlawful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (App. Div. 2003) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 24 (1994)).

Because Plaintiffs' injury was not caused by the alleged unlawful conduct, the NJ CFA claim must be dismissed.  According to Plaintiffs, Choice Point intentionally deceived Plaintiffs into believing that the "asset" Choice Point had located was a small military life insurance policy with a value that was substantially less than the actual value of the asset.  This alleged misrepresentation, in turn, affected Plaintiffs' belief about the amount of Choice Point's finder's fee, which was calculated as a percentage of the asset's value.  Assuming *arguendo* that Choice Point's actions amount to an "unlawful practice" under the NJ CFA, no ascertainable loss resulted from this alleged deception because the parties do not dispute that Plaintiffs never paid Choice Point any finder's fee.

The only harm present in this case-- interference with the Carton estate's possession and potential sale of the Forest Laboratories stock certificates-- could not have resulted from Choice Point's alleged misrepresentations.  It is not possible under these facts (nor do Plaintiffs allege) that Choice Point's alleged deception induced Plaintiffs to cause Mellon to erroneously deliver the certificates to Choice Point.  Plaintiffs never executed the Irrevocable Stock Power that Choice Point sent them.

(O'Conner Ex. 6)  While it is not clear how Choice Point came to

possess the stock certificates, Plaintiffs do not assert, nor does

the evidence support, that Choice Point's possession was caused by

the alleged misrepresentations that were made to Plaintiffs.

Accordingly, the NJ CFA claim must be dismissed.


(2)  New Jersey Unclaimed Property Act Claim

Plaintiffs purport to make a claim under § 46:30B-106 of New

Jersey's Unclaimed Property Act ("NJ UPA") which states:

> Unenforceable agreements.  All agreements to pay
> compensation to locate, deliver, recover, or assist in
> the recovery of property reported under this chapter,
> made within 24 months after the date that the property
> is paid or delivered to the administrator,[19] are void and
> unenforceable.  Agreements entered into any time after
> such 24-month period are valid only if the fee or
> compensation agreed upon is not more than 20% of the
> value of the property recovered, the agreement is in
> writing, signed by the apparent owner, and clearly sets
> forth the nature and value of the property and the value
> of the apparent owner's share after the fee or
> compensation has been deducted.  Agreements entered into
> before the property was presumed abandoned are valid
> only if the fee or compensation agreed upon is not more
> than 35% of the value, the agreement is in writing,
> signed by the apparent owner, and clearly sets forth the
> nature and value of the property and the value of the
> apparent owner's share after the fee or compensation has
> been deducted.  However, nothing in this section shall
> be construed to prevent an owner from asserting at any
> time that an agreement to locate property is based upon
> an excessive or unjust consideration. (emphasis added)


Choice Point correctly asserts that this section is

inapplicable to this case, as it applies only to agreements

---

[19]  The "administrator" is the New Jersey State Treasurer. N.J.S.A. §
46:30B-6.

14

concerning property that has been reported to the State of New Jersey to be abandoned.  *In re Estate of Campbell,* 327 N.J. Super. 96, 97 (1999) ("the Legislature has declared unenforceable, in some respects, and restricted, in other respects, agreements 'to pay compensation to locate, deliver, recover, or assist in the recovery of property reported under' the Uniform Unclaimed Property Act. Here, however, the provisions of N.J.S.A. 46:30B-106 do not apply because no property was abandoned and paid into that fund."). However, Plaintiffs argue that the Court "should find that victims of unlawful finder's fee agreements prohibited by N.J.S.A. 46:30B-106 have a private right of action because it will further the purpose of the statute."  (Id.)  Plaintiffs do not cite any case finding a private right of action under the NJ UPA and this Court has found no such case.

"New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action."  *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 271 (2001).  Moreover, when, as here, a statute expressly provides for enforcement by the State[20] and does not expressly provide for suits by private citizens, New Jersey courts have held that no private right of action exists. *See, e.g., Med. Soc'y v. AmeriHealth HMO, Inc.*, 376 N.J. Super. 48,

---

[20]  *See* N.J.S.A. §§ 46:30B-97 - 46:30B-97.3 (empowering state treasurer "for and on behalf of the State of New Jersey" to commence an action "to enforce any aspect of this chapter in any manner.").

59 (App. Div. 2005)("We generally do not infer a private right of action where the statutory scheme contains civil penalty provisions. . . . the [Healthcare Information Networks and Technology] Act does not specifically authorize private parties to file enforcement actions.  The Act, by its terms, is to be enforced by the Commissioner of Banking and Insurance.").

More specifically, the Court cannot hold that the New Jersey Legislature, by passing the NJ UPA, intended to create a private cause of action against companies such as Choice Point that charge a fee for the service of locating lost property.  The clear purpose of the statute was to establish when and how unclaimed property will escheat to the state.  The rights and obligations created by the statute are those between the State, the holder of the property, and the owner of the property: "the Act provides that the title to unclaimed property does not vest in the State, but rather remains in the owner.  The question is no longer whether the owner shall forfeit the property to the State as it had been when there was an absolute escheat, but rather whether the State or the holder shall have use of the property until the owner claims it and whether the State or the holder shall enjoy the windfall if the owner never claims it."  *Clymer v. Summit Bancorp,* 171 N.J. 57, 63 (2002).

Section 46:30B-106 is merely ancillary to the statute's purpose, as illustrated by its placement under Article 35, which is entitled "Miscellaneous."  Thus, the Court declines to hold that

16

the Legislature intended to confer on private individuals such as Plaintiffs a cause of action against companies like Choice Point. Inferring a right of action here would not be "consistent with the underlying purposes of the legislative scheme." *R.J. Gaydos Ins. Agency, Inc.,* 168 N.J. at 255.[21] Accordingly, Plaintiffs' NJ UPA claim will be dismissed.

(3)  Common Law Claims

Count Three of the Complaint alleges tortious interference with Plaintiffs' property.  Count Four alleges fraud.  Count Five alleges breach of Choice Point's duty "to accurately and completely identify the nature and value of the assets in the agreement with Plaintiff."  Counts Six and Seven allege, respectively, that Choice Point "exercised dominion over assets and property that belonged to the plaintiff;" and "interfered with the plaintiff's possession and control over their assets and property."

Choice Point asserts that these counts are entirely derivative of the statutory claims and in any event, the counts do not state valid causes of action under New Jersey law.  Plaintiffs respond that they have stated valid causes of action for fraud, tortious

---

[21] "To determine if a statute confers an implied private right of action, courts consider whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy. . . . the primary goal has almost invariably been a search for the underlying legislative intent." *R.J. Gaydos Ins. Agency, Inc.*, 168 N.J. at 255.

interference, and conversion.  (Pls. Br. at 39)

First, the fraud count will be dismissed.  Plaintiffs reason that "since plaintiffs specifically plead that they relied on defendant's misrepresentations and omissions as to the amount of the fee, and the false military address in Colorado in entering the agreement, the fourth count pleads a valid claim for fraud."  (Pls. Br. at 39)  These allegations are insufficient as a matter of law.

"To establish a claim for common-law fraud, a plaintiff must demonstrate that: (1) defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material, and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission <u>to its detriment</u>." *Zorba Contrs., Inc. v. Hous. Auth.*, 362 N.J. Super. 124, 139 (App. Div. 2003)(emphasis added).[22]  Just as Plaintiffs' NJ CFA claim fails for lack of a causal connection, their fraud claim must fail for lack of reliance to their detriment.  As discussed above, Plaintiffs do not allege, nor does the evidence suggest, that they sustained any detriment or harm as a result of Choice Point's alleged misrepresentations and omissions.  Accordingly, Count 4 will be dismissed.

---

[22] *See also Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 521 (D.N.J. 1999) ("Satisfaction of the elements of common law fraud under New Jersey law requires proof the defendant made: (1) a material representation of a present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) which resulted in reasonable reliance by plaintiff and (5) <u>which resulted in damages</u>.")(emphasis added).

Second, Plaintiffs assert that Choice Point breached its duty "to accurately and completely identify the nature and value of the assets in the agreement with Plaintiff." (Compl. at 10-11) Plaintiffs' opposition completely ignores this count, failing to explain how this count states a separate cause of action.

There is no free-standing general common law duty to "accurately and completely identify the nature and value of property." In any event, Plaintiffs' fraud and NJ CFA claims render the "breach of duty" claim entirely duplicative. Moreover, allowing Plaintiffs to proceed on this claim would be tantamount to inferring a private right of action under the NJ UPA. For the reasons explained above, the Court will not do so. Accordingly, Count 5 will be dismissed.

Third, "[c]ommon law conversion under New Jersey law is defined as 'the exercise of any act of dominion in denial of another's title to ... chattels, or inconsistent with such title.'" *Marsellis- Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 525 (D.N.J. 1999) (quoting *Mueller v. Technical Devices Corp.*, 8 N.J. 201, 207 (1951)). "Accordingly, the elements of common law conversion under New Jersey law are the existence of property and the right to immediate possession thereof belonging to plaintiff, and the wrongful interference with that right by defendant." *Id.*

While Plaintiffs do not expressly identify any single count as a claim for conversion, it is clear that Counts 6 and 7 each allege conversion. Those counts allege that Choice Point "exercised

dominion over assets and property that belonged to the plaintiff"
and "interfered with the plaintiff's possession and control over
their assets and property."

At oral argument, counsel for Choice Point argued that in this
case, Choice Point's possession was not wrongful, therefore
Plaintiffs failed to state a claim for conversion.  Specifically,
counsel reasoned that because the parties had agreed that "only
Choice Point will recover the asset" (Malin Cert. Ex. C), and
Plaintiffs undisputedly did not honor that agreement, Choice Point
was entitled to take possession of the stock certificates.

The Court is not persuaded by this argument, which essentially
asserts that Choice Point was justified in holding the stock
certificates.  A non-breaching party to a contract may not resort
to self-help upon the other party's breach.  Remedies for breach
are established by law or by the contract itself.[23]  *See Linan-Faye
Constr. Co. v. Housing Auth.,* 49 F.3d 915, 921 (3d Cir.
1995)(discussing the availability of contractual and common law
remedies for breach of the parties' contract).  Here, nothing in
the parties' agreement gave Choice Point the right to take
possession of the stock certificates upon Plaintiffs' breach.
Moreover, there is no common law right to take possession of a
breaching party's property upon breach.  Instead, the non-breaching
party must resort to judicial remedies, such as a suit for damages,

---

[23]   A liquidated damages clause is the classic remedy established by
contract.

replevin, or specific performance.  *See generally* Restatement (Second) of Contracts § 345 (judicial remedies available upon breach of contract).  Therefore, Choice Point's alleged possession of the stock certificates may have been wrongful, notwithstanding Plaintiffs' breach of the asset recovery agreement.

Because both Counts 6 and 7 allege Choice Point's wrongful interference with the Carton estate's possession of the stock certificates, they both state claims for conversion.  Accordingly, these claims will not be dismissed.  However, to avoid duplicity, the Court will hereafter treat Counts 6 and 7 as alleging a single count of conversion.

Lastly, Plaintiffs assert a claim for tortious interference with prospective economic advantage.  Plaintiffs must allege that: (1) they had "some protectable right," or "reasonable expectation of economic advantage;" (2) "the interference was done intentionally. . . without justification or excuse;" (3) "the interference caused the loss of the prospective gain;" and (4) "the injury caused the damage."  *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751 (1989).

Plaintiffs assert that Choice Point intentionally maintained possession of the Forest Laboratories stock owned by the Carton estate for three years.  As a result, the estate could not sell the shares at a higher price.  As discussed above in the standing analysis, Choice Point's alleged interference may have caused damage to Plaintiffs that could be remedied by an award of damages.

21

*See* Restatement (Second) of Torts § 927.  Accordingly, the Court will not dismiss the tortious interference claim.[24]

## IV.

For the foregoing reasons, the Court concludes that Plaintiffs have constitutional standing to bring the present suit.  Therefore, Choice Point's motion pursuant to Fed. R. Civ. P. 12(b)(1) will be denied.

Choice Point's Fed. R. Civ. P. 12(b)(6) motion will be granted as to Counts 1 (NJ CFA); 2 (NJ UPA); 4 (fraud); and 5 (breach of duty).  The motion will be denied with respect to Counts 3 (tortious interference); and Counts 6 and 7 (conversion).  Counts 6 and 7 will hereafter be construed as one count.

The Court will issue an appropriate order.


Date: September  _14th_ , 2006


                                   s/*Joseph E. Irenas*
                                   **JOSEPH E. IRENAS, S.U.S.D.J.**

---

[24]  The Court recognizes that in this case there is substantial (and perhaps complete) overlap between Plaintiffs' conversion claim and their tortious interference claim.  However, because the elements of the claims are different the Court declines to rule at this time that under no set of facts could Plaintiff prevail on one and not the other.